Michael J. OLIVIERI, J. Mathew Foreman, Michael Dillinger, Tom Kohler, Richard Ferrara, Edmund W. Trust, Hugh R. Bruce, John D. Edwards, Joseph Brown, Julius J. Spohn, Bernard L. Tansey, Clint Winant, James Doyle, David Lawlor, Jim Cannon, Ned Lynam, Edward Byrne, Michael Conley, Edward Harbur, Robert J. Buel, Christopher Wesolowski, Gary W. Spokes, Dignity-New York, Plaintiffs-Appellees,

v.

Benjamin WARD, in his official capacity as Police Commissioner of the City of New York, Edward I. Koch, in his official capacity as the Mayor of the City of New York and the New York City Police Department, Defendants-Appellants.

No. 1573, Docket 86–7479.

United States Court of Appeals,
Second Circuit.

Argued June 26, 1986.

Decided Sept. 16, 1986.

Stephen J. McGrath, New York City (Frederick A.O. Schwarz, Jr., Leonard Koerner, David Drueding, Jonathan L. Pines, Corp. Counsel, New York City, of counsel), for defendants-appellants.

Ronald K. Chen, New York City (Stuart W. Gold, J. Pope Langstaff, Jennifer J. Raab, New York City, of counsel), for plaintiffs-appellees.

Abby R. Rubenfeld, New York City (Paula L. Ettelbrick, Andrew Dillman, New York City, of counsel), for amicus curiae Lambda Legal Defense and Educ. Fund, Inc.

Before NEWMAN, CARDAMONE, and PIERCE, Circuit Judges.

CARDAMONE, Circuit Judge:

This expedited appeal arises from one aspect of the "Gay Pride Parade" held in Manhattan on Sunday June 29, 1986. Plaintiffs are Dignity-New York, a not-for-profit New York Corporation (Dignity), Michael Olivieri, its president, and 21 other gay Catholic members of Dignity-New York. Defendants are Benjamin Ward, as Police Commissioner of the City of New York, Edward I. Koch, as Mayor of New York, and the New York City Police Department. Plaintiffs, who instituted suit in the United States District Court for the Southern District of New York (Motley, C.J.) claiming infringement of their civil rights under 42 U.S.C. § 1983 (1982), sought a declaratory judgment and a permanent injunction. Following trial, Chief Judge Motley handed down a thorough opinion and a brief order that in substance granted plaintiffs the relief they sought.

## BACKGROUND

The focus of this controversy is the public sidewalk in front of St. Patrick's Cathedral on the east side of 5th Avenue between 50th–51st Streets in midtown Manhattan. Plaintiffs sought to conduct a peaceful demonstration there during the hours from 1 P.M. to 3 P.M. while the annual Gay Pride Parade passed in its march south from Central Park to Greenwich Village. Defendants refused plaintiffs unlimited access to the sidewalk because they thought it was a focal point for potential confrontation with counterdemonstrators formed loosely into a Committee for the Defense of St. Patrick's Cathedral (Committee). This group, whose president is Herbert McKay, draws its members from the Knights of Columbus, Ancient Order of Hibernians, Catholic War Veterans, groups of Orthodox Jews and other organizations. These counterdemonstrators have been present behind police barricades on the west side of 5th Avenue across the street from the Cathedral for the past five annual Gay Pride Parades. As a result of their fears, Commissioner Ward and the City Police Department planned to close the sidewalk in front of the Cathedral to plaintiffs, other demonstrators and counterdemonstrators, and the public at large for the duration of the 1986 parade. It was that decision that prompted

the instant lawsuit before Chief Judge Motley.

## PROCEEDINGS BELOW

During the eight days of trial—that commenced on May 12 and concluded May 21, 1986—the trial court heard testimony from 11 witnesses and reviewed and received a number of exhibits into evidence. Among those testifying were the police officials in charge of this and past year's parades, a member of Dignity-New York serving as coordinator of this year's parade, the Rector of St. Patrick's Cathedral, and leaders of the counterdemonstrators. The trial judge handed down an opinion on June 13, 1986, 637 F.Supp. 851, which concluded that freezing the sidewalk was not a reasonable time, place and manner restriction on the exercise of plaintiffs' rights of free speech because it was not content-neutral. The district court believed that the police had given the counterdemonstrators a "heckler's veto" and that the Police Department's estimations of violence were not credible, and hence were pretextual. The district court found "a certain excessive sensitivity to the Catholic Church on the part of police officials" that supported its conclusion that the speech restriction was not content-neutral. The trial court also stated that the limitation imposed was not adequately tailored to further any significant governmental interest. No analysis was undertaken regarding whether the sidewalk freeze allowed plaintiffs adequate alternatives to express their message.

Chief Judge Motley declared defendants' decision to prohibit Dignity access to the sidewalk adjacent to St. Patrick's an unconstitutional restraint on plaintiffs' First Amendment rights. The district court thereupon granted a permanent injunction enjoining defendants from preventing up to 100 members of Dignity from peacefully demonstrating on the public walk before the Cathedral for the duration of the "Gay Pride Parade" on June 29, 1986 and "during subsequent annual Gay Pride Parades." Defendants were granted the right to apply for modification of the injunction based on a substantial change in circumstances.

## PROCEEDINGS BEFORE THIS PANEL

Five days after the trial court handed down its June 13 opinion defendants appealed, and the matter was ordered expedited to this panel for an oral argument that was heard on Thursday June 26, 1986. The three days available until the June 29 parade provided an insufficient time to draft an opinion adequately resolving the significant issues raised. We therefore attempted during oral argument to induce the parties to agree on a limited number that would demonstrate in front of the Cathedral. In response to this suggestion, the City of New York proposed that 20 of plaintiffs' members remain in an enclosed area depicted in trial exhibit # 193 for 45 minutes and—after a 30 minute interval—a similar number of counterdemonstrators occupy the same area for the same period of time.

Trial exhibit # 193 is a photo taken during the 1985 parade and was referred to by the panel and counsel during oral argument. The view is one looking down on a barricaded area—resembling a chute—leading from the 5th Avenue curb to the foot of the steps at the main entrance of St. Patrick's Cathedral. In response to the City's proposal, a letter from plaintiffs' counsel of Friday June 27 stated that plaintiffs would agree to limit its demonstrators to 75 persons in a "pen located in the center of the sidewalk" for 45 minutes and would also agree to counterdemonstrators coming into the area during the second half of the parade. The smaller number proposed by the City was not acceptable.

In view of the impasse, we handed down an order on Friday June 27 which, on our own motion, stayed the injunction issued by the district court, subject to certain conditions. Principal among the conditions was that defendants permit 25 members of Dignity to demonstrate peacefully for 30 minutes during the parade within the confines of the police barricade shown on exhibit

# 193 and that defendants permit the same number of those opposed to Dignity to demonstrate for the same time in the same area, separated by a 30 minute interval. The police were granted authority to close the sidewalk to the general public during the parade and to impose more restrictive measures if in their professional judgment circumstances at or near the site posed a danger to public safety.

According to news reports the parade went off as scheduled with more than 12,-000 marching by St. Patrick's Cathedral. The scenario fashioned by the order apparently went smoothly as both Dignity and the Committee demonstrated for their allotted times in front of the Cathedral without serious incident.[1]

## DISCUSSION

### A. *General Rules*

In considering the general rules applicable to the present litigation we begin on common ground. The right of defendants as city officials to limit freedom of speech on a public sidewalk—held since time immemorial for the use of the public, *Carey v. Brown,* 447 U.S. 455, 460, 100 S.Ct. 2286, 2289, 65 L.Ed.2d 263 (1980)—is sharply restricted to those regulations that are necessary to serve a compelling state interest and that are narrowly drawn to achieve that end. *Consolidated Edison Co. v. Public Service Comm'n,* 447 U.S. 530, 540, 100 S.Ct. 2326, 2334, 65 L.Ed.2d 319 (1980); *Police Department of Chicago v. Mosley,* 408 U.S. 92, 101, 92 S.Ct. 2286, 2293, 33 L.Ed.2d 212 (1972). Yet the First Amendment does not guarantee an absolute right to anyone to express their views any place, at any time, and in any way they want. *Heffron v. International Society For Krishna Consciousness,* 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981). The activities of Dignity and the Committee are subject to reasonable time, place and manner restrictions to further significant government interests. *Grayned v. City of Rockford,* 408 U.S. 104, 115, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972). The well-established tests for assessing the validity of such a restriction require that it (1) be content-neutral, (2) be narrowly tailored to meet a significant governmental interest, and (3) leave open ample alternative means of communication. *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3068, 82 L.Ed.2d 221 (1984).

### B. *Scope of Review*

Before considering the validity of the restriction imposed here, it is necessary to examine a court's power to review a department rule or regulation. In *Clark v. Community For Creative Non-Violence,* the Supreme Court sustained a National Park's Service Regulation that prohibited overnight sleeping in Lafayette Park and The Mall in Washington, D.C., over claims that the regulation violated demonstrators' right to free speech. In reversing the District of Columbia Circuit Court of Appeals, the Supreme Court noted that the circuit court's suggestions respecting reducing the size or duration of the demonstration represented no more than fine-tuning of the regulation in an area where courts have no expertise. 468 U.S. at 299, 104 S.Ct. at 3072. That Court of Appeals now views the judiciary's role as confined to upholding regulations that are constitutional and striking down those that are not. *White House Vigil v. Clark,* 746 F.2d 1518, 1531–32 (D.C.Cir.1984). Based upon this view

---

1. Counsel submitted a Joint Statement of Agreed Facts dated August 30, 1986 following the 1986 Gay Pride Parade. It revealed that the barricaded demonstration pen was not as depicted in trial exhibit # 193, but rather on the north end of the east sidewalk in front of St. Patrick's Cathedral. It further appears from the Joint Statement that when Dignity came onto the Cathedral sidewalk there were 150 police officers in front of the Cathedral. Counterde-monstrators, identified as members of Orthodox Jewish groups, Catholic War Veterans and the "Bayside" group, reached a peak number of 150. Although as Parade participants passed in front of counter demonstrators, they directed derogatory obscenities at Catholic nuns, priests and Cardinal O'Connor, there were no reported incidents of violence, nor were there any attempts by counter demonstrators to break the line of march.

defendants urge that the district court's findings on the potential for violence are beyond judicial competence. We cannot agree.

■ A court's power to review government restrictions imposed on the exercise of a First Amendment right occupies middle ground between extremes. It does not kowtow without question to agency expertise, nor does it dispense justice according to notions of individual expediency "like a kadi under a tree." *Terminiello v. Chicago*, 337 U.S. 1, 11, 69 S.Ct. 894, 899, 93 L.Ed. 1131 (1949) (Frankfurter, J., dissenting). "Because the excuses offered for refusing to permit the fullest scope of free speech are often disguised, a court must carefully sort through the reasons offered to see if they are genuine." *Olivieri v. Ward*, 766 F.2d 690, 691 (2d Cir.1985). The district court performed that sorting process by means of the full trial that it conducted and the thorough opinion it handed down.

■ When First Amendment concerns are involved a court " 'may not simply assume that [a decision by local officials] will always advance the asserted state interests sufficiently to justify its abridgement of expressive activity.' " *City of Los Angeles v. Preferred Communications, Inc.*, — U.S. ——, 106 S.Ct. 2034, 2037, 90 L.Ed.2d 480 (1986) (quoting with approval *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 803 n. 22, 104 S.Ct. 2118, 2128 n. 22, 80 L.Ed.2d 772 (1984)). When reviewing the reasonableness of time, place and manner restrictions on First Amendment rights, a court must independently determine the rationality of the government interest implicated and whether the restrictions imposed are narrowly drawn to further that interest. In the instant case, we agree with the district court that the restrictions imposed were not drawn solely to further the government's conceded interest in public safety.

### C. *Fashioning a Rule for the Instant Case*

■ Thus, here the district court properly reviewed the proposed restriction and correctly concluded that Dignity's presence on the walk is assured as an exercise of its members' constitutional rights. Insofar as the trial court went on to find that the counterdemonstrators had no real interest of their own in being on the sidewalk—but simply wanted to keep Dignity's members off—its opinion and order did not protect the constitutional rights of the Committee as counterdemonstrators to convey their message in opposition to that expressed by Dignity. In this respect, we believe the district court erred.

The message that plaintiffs seek to convey is that they are members of the Catholic Church which they do not forsake because of their homosexuality. Since St. Patrick's Cathedral is the see for the Roman Catholic Archdiocese of New York and serves, the Committee believes, as a symbol of religious and family values they think is under attack by the gay demonstrators, the potential for confrontation and violence is obviously present when the opposing groups share the same public forum at the same time. It is not up to the city or its officials to determine those issues worth debating in a public forum. In the field of expression all ideas are considered equal. "Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say." *See Police Department of Chicago v. Mosley*, 408 U.S. at 96, 92 S.Ct. at 2290. Thus, both groups are entitled to be present before St. Patrick's Cathedral during the Gay Pride Parade.

The questions—which now apparently arise each year—are how much of a presence, where on the walk, and for how long a period are Dignity and the Committee entitled to? Ordinarily, a court would simply rule on the constitutional validity of the restraints imposed and refrain from devising its own plan. Yet here time constraints forced the district court—and this Court, too—to choose between striking down defendants' order freezing the sidewalk or

deferring to government imposed limitations on First Amendment rights. Neither alternative was desirable: to choose the former risks ignoring public safety concerns because demonstrators and counterdemonstrators would at the same time occupy the sidewalk with the public; by choosing the latter, a court abdicates its independent responsibility to examine the constitutionality of First Amendment restrictions—it simply adopts them. The scheme devised by the district court steered a middle course between these extremes—limiting Dignity's members, yet upholding the exercise of their communicative rights. Obviously under such circumstances courts must and do have the power to rule in this fashion. *Spring Mills, Inc. v. Ultracashmere House, Ltd.*, 724 F.2d 352, 355 (2d Cir.1983) (district court has wide range of discretion in framing an injunction to prevent wrongful conduct). Appellate review is limited to the question of whether the district court abused its discretion. *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931–32, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975).

■ The critical questions—as a practical matter—are (1) how many individuals need be on the sidewalk to convey Dignity's and the Committee's messages with some impact to the line of marchers and to the public, and (2) how can the size, positioning, and timing of these competing groups be accommodated to legitimate public safety concerns. Concededly, permitting two individuals to occupy the sidewalk as in past parades is *de minimis*, constituting more of a symbolic than an actual presence. Yet because the district court's order that permitted 100 members of Dignity to occupy the entire sidewalk from 50th to 51st Street for the duration of the Parade was issued without consideration of the rights of the Committee, it is subject to modification. *See White House Vigil for the ERA Committee v. Watt*, 717 F.2d 568, 571–72 (D.C.Cir.1983) (injunction that rests analysis on an erroneous premise may be modified). Those portions of a decree that are disapproved of may be modified by an appellate court. *Payne v. Travenol Laboratories, Inc.*, 673 F.2d 798, 828–29 (5th Cir.), cert. denied, 459 U.S. 1038, 103 S.Ct. 452, 74 L.Ed.2d 605 (1982); *Sledge v. J.P. Stevens & Co.*, 585 F.2d 625, 644, 651–52 (4th Cir.1978). In our view it is preferable at present that each group have an equal time of 30 minutes on the walk, separated by 30 minutes during the two-hour march. Such plan accommodates Dignity, the Committee, and public safety concerns, at least for the 1986 parade. Moreover, the idea of sharing the walk is one that plaintiffs and defendants agreed to in separate letters addressed to the Court following oral argument.

Further, the police suggestion of a barricaded enclosure for demonstrators and counterdemonstrators was not intended to limit the exercise of free speech. Instead, it is a practical device used by the police to protect those actively exercising their rights from those who would prevent its exercise. We conclude that this type of manner and place restriction is content-neutral since it is applicable to both groups. Further, it is adequately tailored to promote the significant governmental interest in public order. It also provides a reasonable alternative for communication, rather than the requested use of the entire block-long stretch of the sidewalk. In addition, the suggestion to confine the demonstrators to this enclosure was also accepted by plaintiffs. Again, with the luxury of hindsight—denied the district court because we write after the parade is over—we now know that both demonstrators and counterdemonstrators appeared and used this enclosure for their allotted time. This speaks well for all concerned, not the least of whom are the New York City police who over the years have guarded successfully the safety of demonstrators and the public during this parade.

Having agreed to the duration and a specific place on the sidewalk, the number to be permitted becomes somewhat easier

to determine as that is limited both by the space available and the logistics of moving one group out and another into the area. Granted 100 people would make a bigger impact in conveying the message of demonstrators than 25, but the incremental impact of 75 more people is not justified by the added risks defendants encounter in dealing with four times as many individual demonstrators.

### D. *Permanent Injunction*

Finally, we consider the permanent injunction ordered by the district court in this matter that we stayed on June 27, and now reverse. In its place will stand our order of that date. If interested parties seek to modify this order, they will have the burden of showing to the district court that significantly changed circumstances warrant it. Over the past several years counsel, the trial court, and this Court have devoted considerable time to the significant constitutional issues raised by this litigation. The parties now have the considered judgment of this Court in the resolution of the issues presented. We do not think therefore that our order should be modified readily or that this litigation should—like the Gay Rights Parade—become an annual event.

### CONCLUSION

Insofar as the district court's judgment declared that defendants' order closing the sidewalk infringed plaintiffs' civil rights, it is affirmed; insofar as the injunction permanently enjoined defendants from preventing 100 of plaintiffs' members to demonstrate before St. Patrick's Cathedral for this and succeeding year's parades, it is reversed. In place of the district court's injunction stands this Court's order of June 27, 1986, 795 F.2d 1005, which may be modified by a district court only by a showing of significantly changed circumstances or by agreement.

Affirmed, as modified, in part. Reversed in part.