**PLEDGE OF RESISTANCE, et al.**

v.

**WE THE PEOPLE 200, INC., et al.**

**Civ. A. No. 87–3975.**

United States District Court,
E.D. Pennsylvania.

July 10, 1987.

David Kairys, Philadelphia, Pa., for plaintiffs.

Ralph Teti, Philadelphia, Pa., for City of Philadelphia.

Joan Garner, Philadelphia, Pa., for the Government.

## MEMORANDUM AND ORDER

FULLAM, Chief Judge.

Plaintiffs, a group of otherwise unrelated organizations which, for convenience, may loosely be termed anti-war protest groups and civil rights groups, together with various individuals involved in those organizations, claim that their constitutional rights have been and are likely to continue to be violated by the defendants in connection with the ongoing observance of the 200th anniversary of the United States Constitution. The defendants include We the People 200, Inc., an organization which is the vehicle for providing the many public ceremonies commemorating the bicentennial of the Constitution; the National Park Service, which has responsibility for the various public parks and historic shrines which are the logical locations for many of these celebratory events; the City of Philadelphia and various Philadelphia police officers; the agent-in-charge of the local office of the Federal Bureau of Investigation; and individual personnel of the National Park Service.

Of immediate concern is plaintiffs' motion for a preliminary injunction. An evidentiary hearing on that application was held on July 8, 1987, followed by oral argument on July 9. Because of the imminence of certain additional bicentennial ceremonies to which the requested injunctive relief would be applicable, it is necessary to reach a prompt decision. As a result, this Memorandum will necessarily be somewhat abbreviated.

It bears emphasis that what is being decided at this time is whether preliminary injunctive relief is warranted by the evidence thus far presented. That evidence has focused upon two discrete issues: (1) the alleged denial of plaintiffs' First Amendment rights through limitations

upon plaintiffs' attempts to communicate ideas—through leafletting, carrying signs, and other forms of peaceful demonstration—primarily by denial of access to public fora; and (2) infringement of plaintiffs' constitutional rights through alleged improper surveillance and undercover infiltration of meetings of the plaintiff organizations.

## I. ACCESS TO BICENTENNIAL FESTIVITIES

On May 25, 1987, as part of the Memorial Day weekend aspect of the bicentennial celebration, Vice-President Bush and other dignitaries were scheduled to appear on a program to be conducted out of doors, immediately in front of Independence Hall in Philadelphia. Plaintiff Pledge of Resistance organized a march and demonstration which was planned to occur at about the same time. The participants in the Pledge demonstration intended to march to the area of Independence Mall where an official "soap box" had been established by We the People 200, Inc. to remind us of our First Amendment heritage. The marchers also brought along three or four soap boxes of their own, which they planned to utilize for the expression of their views at locations around the perimeter of the mall.

At this point, a bit of geography is in order. Independence Hall is located on the south side of Chestnut Street. Immediately across Chestnut Street to the north, Independence Mall extends one full block to Market Street. At the northern end, near the Market Street side, is located the building housing the Liberty Bell. Farther to the north, across Market Street, is the "Lewis Quadrangle," in which is situated, among other things, a temporary pavilion associated with the bicentennial celebration.

The May 25 events organized by We the People 200, Inc. included speeches by the Vice-President and others from a raised platform immediately in front of Independence Hall. Chairs for VIP attendees were located in Chestnut Street and at the south end of Independence Mall.

Up until May 24, the official soap box had been located immediately adjacent to the building housing the Liberty Bell. On the evening of May 24, or in the morning of May 25, the soap box was relocated to a position on the north side of Market Street. From the defendants' perspective, this move was designed to reduce congestion in the walkways adjacent to the Liberty Bell, and served to place the soap box near an attractive fountain and gardens. From the plaintiffs' perspective, the move was designed to ensure that the Pledge demonstrators would be using a soap box which was located immediately adjacent to a temporary restroom, out of the sight and hearing of persons attending the Vice-President's speech.

The route of march which had been worked out between the Pledge demonstrators and the Philadelphia Police Department would have taken the marchers (about 285 in number) on a circuitous route down 4th Street, west on Spruce Street to 7th, up 7th to Market, and then east to the area of the Liberty Bell Pavilion. Actually, because certain streets which the police thought had been blocked off were not, the police accompanied the marchers west on Spruce Street to 5th, up 5th to Walnut, west on Walnut to 7th, and then along the originally planned route. And, apparently, some of the marchers split off and proceeded north on 5th Street to Market.

Be that all as it may, when the Pledge demonstrators approached the northern end of Independence Mall (at 6th and Market and 5th and Market, respectively), police barricades were hurriedly relocated so as to preclude them from gaining access to any part of the mall south of Market Street. They were permitted to use the soap box to the north, and to place their own soap boxes at various locations across 5th Street from the northern end of the mall. All who inquired were told that no organized protest or other demonstration would be permitted within Independence Mall itself, and that no person carrying a sign or leaflets could pass the barricades. Although some were told that they could enter into the mall area if they left their signs and leaflets behind, in point of fact

quite a few persons associated with the Pledge demonstration were denied access to the mall area even without their signs and leaflets; and various persons not even associated with the Pledge group were refused permission to pass the barricades because they were wearing badges, buttons, T-shirt insignia, or other forms of communication. Indeed, at least one person was refused access to the mall festivities merely for wearing a black armband. At the same time, however, anyone who wore a We the People 200 button, or carried a We the People pennant or flag, was free to enter and attend the mall ceremonies.

■ The justification now advanced on behalf of the federal defendants for enforcing these restrictions is that We the People 200, Inc. had been granted a permit to hold a demonstration in Independence Mall, whereas the Pledge group had not. To the argument that We the People 200, Inc. could not reasonably have been, and was not in fact, granted exclusive access to the entire area of Independence Mall, the federal defendants respond by asserting that, under regulations of the National Park Service, leafletting, sign-carrying and other demonstrations may be conducted on park property only if a permit for such activity has been issued, and these plaintiffs never applied for such a permit.

Plaintiffs argue, with some justification, that everyone knew in advance what they were planning, the Philadelphia Police Department approved it, and nobody ever told them they needed to apply for a permit. Whatever the force of that argument, I need not rest a decision on that ground. The evidence clearly establishes two important facts: (1) Park Service officers are authorized to, and in fact regularly do, consider and grant oral permission for leafletting and sign-carrying on *an ad hoc*, on-the-spot, basis; and (2) persons carrying non-controversial signs, emblems, banners, and insignia were admitted to the mall without restriction. On this record, it is very clear that the failure of the Park Service officers to treat plaintiffs' oral inquiries as a request for a permit, on the

same basis as other persons and groups, was causally related to the nature of the message plaintiffs sought to convey. Obviously, the defendant Park Service personnel sought to prevent plaintiffs from expressing their dissenting views in any manner which might come to the attention of persons attending the Vice-President's speech, and which might detract from the main-stream patriotism reflected by the We the People 200 insignia.

Moreover, as to the second point, individuals wearing small signs criticizing the President's Central American policies had just as much right—as individuals—to attend the We the People 200 celebration as any other member of the public. To exclude them because of the message conveyed by their signs or other insignia, was a clear violation of the Constitution.

I do not mean to suggest that the defendants were obliged to permit disruption of the We the People 200 ceremonies. But it can scarcely be regarded as disruptive to hand out leaflets at the periphery of a crowd, or to lay a wreath outside the Liberty Bell Pavilion, almost a full block away from the Vice-President and other dignitaries. The existence of a permit to use a public forum cannot justify excluding protected expression unless the protected activity will cause actual disruption of the events covered by the permit. See *Irish Subcommittee v. Rhode Island Heritage Commission*, 646 F.Supp. 347 (D.R.I.1986); *Olivieri v. Ward*, 801 F.2d 602 (2d Cir. 1986).

There can be no doubt that the celebration on May 25, and the events scheduled in the near future, were and will be public events. Independence Mall is a public area. When the Park Service issues a permit to We the People 200, Inc. to use these areas for bicentennial celebratory events, members of the public have a right to attend, and to remain in attendance so long as they commit no breach of the peace, or engage in conduct which genuinely interferes with the celebration covered by the Park Service permit. Because the federal defendants did not fully observe these principles with respect to the May 25 events,

and because the record strongly suggests that they may not fully appreciate the reach of the First Amendment with respect to dissenting or controversial expressions, and may therefore attempt to enforce similar restrictions at future bicentennial events, plaintiffs are entitled to limited, carefully structured, injunctive relief.

Because We the People 200, Inc. has not been shown to have caused any constitutional violations, I perceive no need for an injunction against that organization. The same is true of the defendants associated with the Federal Bureau of Investigation. The remaining defendants will be included in the preliminary injunction order, in their official capacities, and primarily as a precautionary measure.

## II. POLICE INFILTRATION AND SURVEILLANCE

■ At the May 25, 1987 gathering, agents of the Federal Bureau of Investigation engaged in photographic surveillance, including still photographs and videotapes, of the crowds attending the various events, and of the marchers and demonstrators affiliated with plaintiff Pledge of Resistance. Plaintiffs were not singled out for this attention: whenever a high federal official entitled to Secret Service protection participates in a public event, the FBI routinely photographs the persons in attendance and nearby, in part for intelligence-gathering for use in identifying suspicious persons whose future conduct bears watching, but primarily for investigative purposes in the event criminal conduct should actually occur. So far as the present record discloses, none of this photographic surveillance activity could reasonably be considered a violation of anyone's constitutional rights. Indeed, it is probable that plaintiffs no longer press any claims related to this kind of surveillance.

■ More substantial issues are presented by plaintiffs' claims about police infiltration of their organizations, but I do not believe the present record justifies the extraordinary relief of a preliminary injunction. The only specific evidence about infiltration relates to the plaintiff Pledge of Resistance. A Philadelphia police undercover officer did attend two or three Pledge meetings in an undercover capacity, and prepared and filed written reports of these meetings, including the names of many of the persons in attendance. Plaintiffs acknowledge that that kind of investigative activity is constitutionally permissible if limited to obtaining information about possible criminal violations, and if based upon reasonable suspicion that the organization in question may become involved in criminal activities. And the defendants concede that any such undercover surveillance which is unrelated to suspected criminal activity, or which is designed to interfere with or deter participation in lawful activities, or which singles out for attention specific organizations by reason of the particular beliefs and objectives of the organization, would violate the constitution. The Philadelphia Police Department has adopted guidelines which purport to reflect this dichotomy.

The defendant police officers justify sending an undercover investigator to one meeting of Pledge of Resistance because of their awareness that local chapters of that organization in other parts of the country had engaged in civil disobedience leading to arrest and prosecution of some of its members. The defendants seek to justify the further undercover surveillance because at one of the meetings of Pledge, when the persons present were discussing what action might be appropriate if the United States should invade Nicaragua or some other Central American country, one of the persons present suggested that, in such event, Pledge should enter the federal building, make a citizen's arrest of some federal official (preferably a congressman or member of a congressional staff), and publicly escort that official to the nearest police station, to request the police to prosecute.

It is agreed that this suggestion was neither adopted nor rejected at that meeting. The entire discussion was in the nature of a brainstorming session, with neither the intent nor the occasion to settle upon any particular course of action. The

undercover officer accurately reported what had occurred, but this has now been described by his superiors in the department as proof that the plaintiff Pledge of Resistance "planned" to "kidnap" a federal official and hold him/her "hostage".

While a dispassionate observer might well conclude that there never has been any genuine justification for undercover surveillance of Pledge of Resistance—an organization which apparently goes to great lengths to eschew violence in any form—it remains a close question whether what has thus far occurred violated anyone's constitutional rights. More importantly, however, I do not believe the present record establishes a substantial likelihood of any further constitutional violations in this respect. Except for general evidence about adherence to the police department's guidelines, there is no evidence of actual infiltration of any of the plaintiff organizations other than the incident described above, and the police appear to be honestly attempting to adhere to the guidelines and to avoid constitutional difficulties. While a more fully developed evidentiary record might lead to a different conclusion, at this preliminary stage plaintiffs have not shown adequate justification for an injunction against police surveillance.

## ORDER

AND NOW, this 10th day of July, 1987, it is ORDERED:

1. As to the defendants We the People 200, Inc. and Wayne G. Davis, plaintiffs' Motion for Preliminary Injunction is DENIED.

2. As to the remaining defendants, plaintiff's Motion for Preliminary Injunction is GRANTED IN PART, as follows:

Said defendants, and all persons acting in concert with them or any of them, are preliminarily enjoined:

a. from denying to plaintiffs or any other person permission to lawfully distribute leaflets and other printed matter or to wear, display or carry signs, placards, or insignia, by reason of the message contained therein and sought to be conveyed;

b. from preventing plaintiffs, individuals or groups from distributing literature, assembling or soliciting signatures in Independence National Historical Park or on streets, sidewalks, parks or other areas open to the public, so long as such activities do not involve breaches of the peace, and do not actually interfere with similar activity by others, or with public events then in progress.

3. This Order shall not be construed to prevent the defendants, in the proper performance of their respective duties, from (1) ensuring the safety and security of governmental officials and members of the public; (2) from enforcing the criminal and other laws and regulations of the City of Philadelphia, the Commonwealth of Pennsylvania, and the United States of America; or (3) from barring unreasonable interference with, or disruption of, ceremonies and staged events in celebration of the Constitutional Bicentennial.