SOUTH BOSTON ALLIED WAR VET-
ERANS COUNCIL, and John J. Hur-
ley, as Parade Adjutant of the South
Boston Allied War Veterans Council,
Plaintiffs,

v.

The CITY OF BOSTON and the
Boston Police Department,
Defendants.

No. CIV.A. 03–10554–RBC[1].

United States District Court,
D. Massachusetts.

Dec. 29, 2003.

---

1. With the parties' consent, this case was referred and reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c).

Chester Darling, Boston, MA, Robert J. Roughsedge, Lawson & Weitzen, LLP, Boston, MA, Michael Williams, Citizens for the Preservation of Constitutional Right, Boston, MA, for South Boston Allied War Veterans Council, John J. Hurley, Plaintiffs.

Mary Jo Harris, Boston Police Department, Boston, MA, for Boston, City of, Bobby Johnson, Defendants.

## *OPINION*

COLLINGS, United States Magistrate Judge.

### I. *Introduction*

This action stems from events that took place on March 16, 2003 at the South Boston St. Patrick's Day parade. Plaintiffs South Boston Allied War Veterans Council and John J. Hurley (hereinafter collectively "the plaintiffs" or "the Council") are responsible for the organization of that annual parade. According to the Council, the City of Boston (hereinafter "the City") and the Boston Police Department (hereinafter "the BPD" or collectively "the defendants") allowed a group known as the Veterans for Peace to march at the end of the Saint Patrick's Day parade without a permit and against the plaintiffs' wishes. By virtue of this litigation, the Council seeks a declaratory judgment to the effect that the defendants violated the plaintiffs' First Amendment rights, an Order from the Court permanently to enjoin the City from interfering with the plaintiffs' speech, an award of nominal damages and, pursuant to 42 U.S.C. § 1988, an award attorneys' fees and costs associated with this proceeding. The defendants deny having violated the Council's constitutional rights and further request that the Court enter an Order to the effect that the end of plaintiffs' parade shall be determined by the last authorized marcher, group or float in the procession, that the City shall place a police vehicle

behind that last marcher, group or float and any unwelcome group will be allowed to march only after that last police cruiser.

## II. Facts

In lieu of filing cross-motions for summary judgment, the parties agreed to stipulate to the facts so as to enable the Court to decide this case on the basis of a written record. See *Brotherhood of Locomotive Engineers v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 31 (1 Cir., 2000)("In a case submitted for judgment on a stipulated record, the district court resolves disputed issues of material fact.") citing *Boston Five Cents Savings Bank v. Secretary of the Department of Housing and Urban Development*, 768 F.2d 5, 11–12 (1 Cir., 1985). The facts as so stipulated, along with facts gleaned from the pleadings, are as follows.[2]

The Council, an unincorporated association of veterans groups, applied for and obtained a permit from the Boston Transportation Department to conduct the annual St. Patrick's Day parade (hereinafter "the Parade") in South Boston on March 16, 2003. The Parade is privately organized by the plaintiffs and the Council asserts the right to include or exclude any units or individuals from participating in the Parade. A group calling themselves the Veterans for Peace (hereinafter "the Protest Group") sought permission from the Council to march in the 2003 Parade but were denied per the Council's discretion to approve or disapprove parade participants.

The BPD deployed about three hundred fifty police officers to service the Parade at an overtime cost of more than fifty-four thousand dollars.[3] The BPD knew before the Parade that the Council had excluded the Protest Group from the parade roster.[4] Indeed, on the day of the Parade, Boston Police Superintendent Bobbie Johnson who was in charge of policing the event, informed his officers that the Protest Group was not authorized to march in the Parade, but that the group would be allowed to march after the Parade had passed.

On March 16, 2003, the Protest Group appeared at the starting point of the Parade to protest the American presence in Iraq and their exclusion from the Parade. At or about 12:55 P.M. that day a police official advised the Protest Group that they would be permitted to march on the Parade route after the last registered group had passed. The police officials intended to have the Protest Group march after the street sweepers[5] but because of safety hazards, they were allowed to march in front of the street sweepers and a police contingent, but behind the body of the Parade.

Up to one million people gather along the parade route to view the Parade. Despite not having a permit, the Protest

---

**2.** Segments of this factual recitation are taken verbatim from joint pleading # 19, Stipulations, albeit without quotation marks.

**3.** The Council exercises no control over the deployment of the Boston police officers or the cost of that deployment and related services. The Council does not pay for the police or any other services provided by the City facilitate the Parade. The City also paid for partial costs associated with the Parade in the amount of approximately eight thousand dollars. This is not a unique occurrence; the City provides funding for various other parades and privately sponsored cultural events in the Boston.

**4.** The parties acknowledge that the decision to exclude the Protest Group was publicized in the media prior to the March 16, 2003 parade.

**5.** The end of the parade is traditionally signified by the street sweepers. (Plaintiffs' Reply # 23, Exh. B at 19)

Group marched along the parade route carrying signs containing anti-war slogans after the body of the Parade had passed. The public response to the Protest Group was both positive and negative, although no major incidents were reported. The presence of the Protest Group and spectator reaction to them was reported in the two local Boston newspapers.

The BPD asserts that it has the right to allow a group to march on the parade route after the Parade has passed. It is the policy of the BPD not to exclude persons, based solely on the content of their speech or message, from assembling or marching after the Parade, provided no public safety risks are presented. The Council, on the other hand, takes the position that its right to conduct a private parade includes the right to prohibit any unwanted group from marching in the Parade and conveying disapproved messages to spectators along the parade route.

### III. Discussion

#### A. The Supreme Court's Decision in the Hurley Case

The First Amendment guarantees that a government entity shall make no law abridging the freedom of speech. Over time, case law has developed underscoring the fundamental importance of protecting speech in the public forum. As stated by the Supreme Court, "[w]e have recognized that the First Amendment reflects a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wide-open.'" *Boos v. Barry,* 485 U.S. 312, 318, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (citations omitted).

The plaintiffs assert that the defendants violated their First Amendment right to freedom of speech when the BPD allowed the Protest Group to march at the end of the Parade. In *Hurley v. Irish–American Gay, Lesbian, and Bisexual Group of Boston,* 515 U.S. 557, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995), the Supreme Court addressed the issue of "whether Massachusetts may require private citizens who organize a parade to include among the marchers a group imparting a message the organizers do not wish to convey." *Hurley,* 515 U.S. at 559, 115 S.Ct. 2338. There is no question but that this Supreme Court decision is controlling.

In *Hurley,* John J. Hurley and the South Boston Allied War Veterans, the identical plaintiffs as in the case at bar, brought an action in the Massachusetts state court arguing that their freedom of speech was violated when the City of Boston forced them to allow the Irish–American Gay, Lesbian and Bisexual Group of Boston (hereinafter "GLBG") to march in their annual St. Patrick's Day parade under the public accommodation laws of the Commonwealth. The Supreme Court overruled the Massachusetts Supreme Judicial Court, holding that "such a mandate violates the First Amendment." *Hurley,* 515 U.S. at 559, 115 S.Ct. 2338.

The *Hurley* Court began its analysis by determining that the St. Patrick's Day parade qualifies for protection under the First Amendment: "Parades are thus a form of expression, not just motion, and the inherent expressiveness of marching to make a point explains our cases involving protest marches." *Hurley,* 515 U.S. at 568, 115 S.Ct. 2338. The Court recited a litany of cases illustrating that parades are forms of expression that must be protected regardless of the message delivered. See, e.g., *National Socialist Party of America v. Skokie,* 432 U.S. 43, 97 S.Ct. 2205, 53 L.Ed.2d 96 (1977)(marching in uniforms displaying swastikas protected by the First Amendment); *Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731

(1969)(wearing an armband to protest a war is a form of protected communication); *Edwards v. South Carolina,* 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963) (marching, carrying signs and singing the national anthem reflects an exercise of basic Constitutional rights). The Court concluded that "[n]ot many marches, then, are beyond the realm of expressive parades, and the South Boston celebration is not one of them." *Hurley,* 515 U.S. at 569, 115 S.Ct. 2338. That the organizers may have been "lenient" in choosing participants for the Parade does not mean that they lost their First Amendment rights; "a private speaker does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message as the exclusive subject matter of the speech." *Hurley,* 515 U.S. at 569–570, 115 S.Ct. 2338.

The Supreme Court was of the view that GLBG's "participation as a unit in the parade was equally expressive" because GLBG sought "to communicate its ideas as part of the existing parade, rather than staging one of its own." *Hurley,* 515 U.S. at 570, 115 S.Ct. 2338. The state enforced participation "alter[ed] the expressive content of [plaintiffs'] parade" and in doing so "violate[d] the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Hurley,* 515 U.S. at 572–573, 115 S.Ct. 2338. As the Court explained:

> Rather like a composer, the Council selects the expressive units of the parade from potential participants, and though the score may not produce a particularized message, each contingent's expression in the Council's eyes comports with what merits celebration on that day. Even if this view gives the Council credit for a more considered judgment than it actively made, the Council clearly decided to exclude a message it did not like from the communication it chose to make, and that is enough to invoke its right as a private speaker to shape its expression by speaking on one subject while remaining silent on another...But whatever the reason, it boils down to the choice of a speaker not to propound a particular point of view, and that choice is presumed to lie beyond the government's power to control.

*Hurley,* 515 U.S. at 574, 115 S.Ct. 2338.[6]

The state cannot force speech onto a private speaker as Massachusetts did by compelling the plaintiffs under the public accommodations law to accept GLBG and its message. That the intent of government was well-meaning carries no weight; the law is "not free to interfere with

---

**6.** *A private parade is under no obligation to distinguish its message from an opposing group with an different message:*

> Although each parade unit generally identifies itself, each is understood to contribute something to a common theme, and accordingly there is no customary practice whereby private sponsors disavow "any identity of viewpoint" between themselves and selected participants.

*Hurley,* 515 U.S. at 576, 115 S.Ct. 2338. Cf. *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 655, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)("Given cable's long history of serving as a conduit for broadcast signals, there appears little risk that cable viewers would assume that the broadcast stations carried on a cable system convey ideas or messages endorsed by the cable operator."); *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 87, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980) (shopping mall owners "can expressly disavow any connection with the message by simply posting signs in the area where the speakers or handbillers stand. Such signs, for example, could disclaim any sponsorship of the message and could explain that the persons are communicating their own messages by virtue of state law.")

speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley*, 515 U.S. at 579, 115 S.Ct. 2338. A speaker has the autonomy to choose the content of his own message particularly in a public forum: "Our tradition of free speech commands that a speaker who takes to the street corner to express his views in this way should be free from interference by the State based on the content of what he says." *Hurley*, 515 U.S. at 579, 115 S.Ct. 2338.

■■■ In sum, the *Hurley* decision stands for the propositions that (1) parades are a function of expression that fall within the sphere of protected speech; (2) a speaker has a right to be free from state interference and has the autonomy to choose what not to say; (3) the parade organizers had a right to exclude groups from their parade and not have the message of an opposing group forced on them by the state. Having outlined the law as set forth by the Supreme Court, the issue to be decided is whether *Hurley* applies when the government inserts a protest group at the end of a parade.

### B. The Defendants' Position

Defendants offer several arguments to dispute the plaintiffs' contention that they violated the Council's First Amendment rights. It is not disputed that the Council has the right to silence unwanted voices of people in their Parade. However, in an attempt to distinguish *Hurley*, it is asserted that because the Protest Group marched after the Parade had passed the Council no longer exerted any rights over the speech on the Parade route.

The defendants attempt to justify their actions on the grounds that because the march took place on a public street, the ability to restrict expressive activity in a public forum is very limited. See *United States v. Grace*, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983). Noting that based the stipulated facts the protest involved political speech, the defendants contend that if they prevented the Protest Group from marching it would serve as a "content-based restriction on political speech in a public forum" and thus be "subjected to the most exacting scrutiny." *Boos*, 485 U.S. at 321, 108 S.Ct. 1157 (emphasis in original).[7] Thus, the defendants highlight the importance of location in staging a protest march: "[T]he Supreme Court has recognized that the specific place where a message is communicated may be important to the message and consequently, of constitutional significance itself." *The Nationalist Movement v. City of Boston*, 12 F.Supp.2d 182, 192 (1998). See also *City of Ladue v. Gilleo*, 512 U.S. 43, 56, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994).

■■■ Moreover, by placing the Protest Group at the end of the Parade, the defendants insist that the BPD was enforcing a justified time, place and manner restriction on the Council's speech. Restrictions on speech in a public forum while extremely limited, are subject to reasonable time, place, manner, restrictions. See *Grayned v. City of Rockford*, 408 U.S. 104, 115, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions. We have often noted that restric-

---

**7.** A content-based restriction requires "the State to show that the 'regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.'"

*Boos*, 485 U.S. at 321, 108 S.Ct. 1157 citing *Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

tions of this kind are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.

*Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (citations omitted). See also *Globe Newspaper Co. v. Beacon Hill Architectural Commission,* 100 F.3d 175, 186 (1996); *McGuire v. Reilly,* 260 F.3d 36, 48 (2001).

In short, the defendants take the position that *Hurley* should not apply because the Protest Group was placed at the end of the Parade for the following reasons: (1) the location of the Protest Group's march was a vital part of its message; (2) the Protest Group's march was political speech in a public forum and not allowing the members to march would have violated their free speech rights under the strict scrutiny analysis test; (3) allowing the Protest Group to march was a legitimate time, place, and manner regulation imposed on the Council because it was a narrowly tailored restriction that served a significant state interest, and was an ample, alternative means for the Protest Group's expression.

### C. The Holding in Hurley Controls the Case at Bar and Supports the Council's Position

■ The defendants' arguments notwithstanding, it is clear to the Court that *Hurley* is applicable to the case at bar. The Protest Group sought permission to march in the plaintiffs' parade which was denied because the Council did not want their message as part of its parade. Because of the defendants' actions, however, the group became attached to the Council's Parade. The media attention focused on the Parade is undisputed, and it underscores the perception that the Protest Group was part of the parade even though it came at the end. There simply was no discernable way to distinguish the protest marchers from the parade body as evidenced by the various newspaper reports and reactions from parade spectators. I find as a fact that the manner in which the defendants allowed the Protest Group to march, i.e., directly after the last group which was an actual participant in the parade, had the effect of creating the perception among those watching the parade that the Protest Group was, indeed, a part of the Council's parade.

I rule that placing the Protest Group at the end of the Parade in this manner violated the plaintiffs' First Amendment rights. The Council is not attempting to silence all opposing speakers at their parade site, but rather only seeks to keep these opposing voices out of their Parade. For example, if the Protest Group sought to demonstrate on the sidewalks or at a staged position that did not interfere with the Parade, the Council would have no standing to bring a First Amendment claim. However, as stated previously, each unit of the Parade is deemed to contribute to the overall message sent forth to the spectators. *Hurley,* 515 U.S. at 577, 115 S.Ct. 2338. Consequently, as a practical matter, there is no difference between placing a group in the middle of a parade or placing it at the end of the Parade. In either case, the government is changing the message of the Parade and that is a violation of the First Amendment.

The Council's interest is to have its permit respected so that it can organize its Parade and deliver its own message. Courts view the permit system as a way of maintaining and fostering speech rather than as a hindrance. In *Thomas v. Chicago Park District,* a municipal ordinance

requiring a permit for group activity in a public park was challenged as unconstitutional because it allegedly violated the First Amendment. *Thomas*, 534 U.S. 316, 319, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002). Justice Scalia, however, agreed with the appellate court that " '[t]o allow unregulated access to all comers could easily reduce rather than enlarge the park's utility as a forum for speech.' " *Thomas*, 534 U.S. at 322, 122 S.Ct. 775 (citations omitted). Furthermore,

> [r]egulations of the use of a public forum that ensure the safety and convenience of the people are not "inconsistent with civil liberties but...[are] one of the means of safeguarding the good order upon which [civil liberties] ultimately depend."

*Thomas*, 534 U.S. at 323, 122 S.Ct. 775 (citation omitted).

The defendants assert that they are not required to prosecute every instance in which a group gathers without a permit to conduct an expressive activity. While that may be true, *Thomas* upholds permitting schemes because they allow groups to voice their opinions free from interference from other opposing groups. *Thomas*, 534 U.S. at 322, 122 S.Ct. 775. That is not to say that counter-demonstrators may not voice their opinions while watching a parade pass by, but the government may not insert an opposing group into a private organizer's permitted parade. If the Protest Group had gathered at a specified point along the Parade route and voiced their opinions peacefully, they would have been well within their First Amendment rights.

█ If they had not allowed the Protest Group to march, the defendants contend that they would have violated the Protest Group's First Amendment rights under the strict scrutiny analysis. The state

does have an interest in fostering speech, but only even-handedly:

> ...government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.... Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say.

*Police Department of the City of Chicago v. Mosley*, 408 U.S. 92, 96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). According to the defendants, placing the Protest Group at the end of the Parade fosters speech and serves a compelling state interest. What the defendants fail to appreciate, however, is that unlike *Mosley*, this is not a case of two sets of speech. The Protest Group, like the GLBG in the earlier litigation, wants to be seen as part of the plaintiffs' expression and not stand on its own. The Protest Group wanted to alter the plaintiffs' speech so that it was seen as being against the war in Iraq. The Council clearly did not want this message emanating from its Parade or it would have allowed the Protest Group to march in the first place.

Had the Council tried to silence an opposing speaker on the sidewalks or other non-permit controlled areas, the BPD would have been justified in protecting the opposing speaker's rights. However, by placing the Protest Group at the end of the Parade so as to make it appear that the Protest Group was part of the Parade, the defendants violated the Council's right to protected speech.

█ The defendants believe that placing the Protest Group at the end of the Parade qualifies as a legitimate time, place, and manner restriction. In *Mosley*, the Supreme Court was careful to acknowledge

that not all picketing must be allowed and that restrictions may be placed on speech. *Mosley*, 408 U.S. at 98, 92 S.Ct. 2286.

> Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions. We have often noted that restrictions of this kind are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.

*Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). In the defendants' view, because there was no public safety concern, denying the Protest Group the right to march would have served as a content-based restriction on their speech. In actuality, however, the converse became true. Placing the Protest Group at the end of the Council's Parade served as a content-based restriction on the plaintiffs' expression. In effect the defendants chose the speech of the protestors over the speech of the Council. By changing the message of the Parade to serve another group, even if that group is a minority, the action is no longer content-neutral.

In an effort to buttress their position, the defendants argue that the issuance of a permit does not transform a public forum into a private one. In *Schwitzgebel v. City of Strongsville*, 898 F.Supp. 1208 (D.Ohio, 1995), aff'd 97 F.3d 1452 (6 Cir., 1996), cert. denied, *DeLong v. City of Strongsville*, 522 U.S. 827, 118 S.Ct. 88, 139 L.Ed.2d 45 (1997), protestors were ejected from a public forum during the 1992 Bush-Quayle presidential rally. While *Schwitzgebel* does stand for the proposition that a public forum remains public despite the issuance of a permit, *Schwitzgebel*, 898

F.Supp. at 1216, the court's analysis did not end with that conclusion. Judge O'Malley explained that the

> "[p]ermit systems are the embodiment of time, place, and manner restrictions that have long enjoyed the approbation of the Supreme Court."...One of the most important reasons behind allowing for government-sponsored permit systems is to prevent a multitude of individuals with different messages from expressing their views simultaneously, resulting in a cacophony where no one's message is heard. Indeed, absent a permit system, an individual could exercise his right to voice his opinion solely for the purpose of drowning the voice of another. Exercise of First Amendment rights to achieve this objective is not constitutionally protected: "the right of free speech ... does not embrace a right to snuff out speech of others."

*Schwitzgebel*, 898 F.Supp. at 1217 (citation omitted). See also *Cox v. Louisiana*, 379 U.S. 536, 584, 85 S.Ct. 466, 13 L.Ed.2d 487 (1965) (arguing that anarchy would ensue if everyone could exercise their free speech rights at the same time and place).

The *Schwitzgebel* court wrote that the government has two significant interests that satisfy the time, place, and manner test. The first interest, safety and order, must be viewed from a large scale perspective and not the impact caused by only one party. *Schwitzgebel*, 898 F.Supp. at 1217. In this case, the defendants view the intrusion of the Protest Group as one isolated incident which did not put public safety at risk because only twenty to thirty people interfered in the Parade. Relying on Supreme Court precedent, the court in *Schwitzgebel* stated that it is the cumulative impact of allowing all single, peaceful intrusions which must be considered rather than just one isolated incident. *Schwitzgebel*, 898 F.Supp. at 1218 citing

*Heffron v. International Society of Krishna Consciousness, Inc.,* 452 U.S. 640, 652–654, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981). The plaintiffs assert that if the defendants are allowed to insert one group at the end of the Parade, there is really nothing to stop them from attaching several groups so that the parade message will conform to what defendants want it to say. This point is well taken.

The second interest is that of "guaranteeing citizens the right to participate in events or demonstrations of their own choosing without being subjected to interference by other citizens...regardless of how insubstantial or insignificant it might appear." *Schwitzgebel,* 898 F.Supp. at 1218. Like the Protest Group in the case at bar, the plaintiff in *Schwitzgebel* was found to have "had an undeniable right to express his views, whatever they were, but not in an area set aside for another event where his intrusion would be an interference." *Schwitzgebel,* 898 F.Supp. at 1218 (citation omitted).

 Most notably the court found that the permit system and the restrictions imposed were content-neutral. Specifically, "content-neutrality must govern the issuance of permits, but, once issued, the permits may be enforced in a way that protects the expression of the permitted message, even to the exclusion of some other message." *Schwitzgebel,* 898 F.Supp. at 1219 (emphasis in original). Thus, under *Schwitzgebel,* the defendants were under an obligation to protect the rights afforded by the Council's permit even if there was a harm to the Protest Group's rights.

In sum, because the *Hurley* decision applies, the defendants violated the Council's First Amendment rights when the BPD placed the Protest Group at the end of the plaintiffs' Parade. Despite the defendants' contentions, no compelling interest existed that warranted the placing of the Protest Group at the end of the Parade line because the protestors wanted to attach their speech to the Council's message. Finally, the defendants' alleged time, place, and manner restriction was invalid because (1) it was not content-neutral in that it altered the plaintiffs' speech, (2) the plaintiffs' permit required that the defendants protect the Council's speech and (3) the plaintiffs' permit required that the Parade be free from interference.

It should be noted that this holding does not grant the Order requested by the plaintiffs that no opposition group be allowed to march on the Parade route until the St. Patrick's Day crowd disperses. Rather, the Court believes that the defendants have discretion in allowing future protests groups to march in accordance with this opinion. As earlier noted, the location of speech is often vitally important to its message. See *The Nationalist Movement,* 12 F.Supp.2d at 192. The Parade carried a message with which other groups may not agree, and this decision is not intended to squelch the opposition's right to protest such views provided the protestors stay within the boundaries set forth herein.

 As stated previously, protest groups may gather and disseminate their message provided they pose no public safety concern on the sidewalks or at other points along the Parade route and that they do not interfere with the permitted area of the Parade itself. If a group wants to march but is rejected by the Council, the defendants may not place the group at the end of the Parade line and let them march.

Courts have provided guidance when dealing with parades and counter-demonstrators. Despite being decided prior to *Hurley, Olivieri v. Ward,* 801 F.2d 602 (2

Cir., 1986), provides a useful example of how the issue of competing demonstrations has been addressed. See also We've Carried the Rich for 200 Years Let's Get Them Off Our Backs—July 4th *Coalition v. The City of Philadelphia*, 414 F.Supp. 611 (E.D.Penn., 1976) (directing city officials how to deal with two opposing parades). In *Olivieri*, members associated with the Gay Rights Parade held in Manhattan brought suit after the defendant, Police Commissioner Ward, closed the sidewalks in front of St. Patrick's Cathedral to demonstrators (a gay-rights group Dignity), counter-demonstrators (St. Patrick's Cathedral Defense Committee) and the public at-large because of a public safety concern. *Olivieri*, 801 F.2d at 603. The district court concluded that this action was not content-neutral and thus violated the plaintiffs' First Amendment rights because it essentially served as a " 'heckler's veto.' " *Olivieri*, 801 F.2d at 604. The Second Circuit stated that

> [t]he critical questions—as a practical matter—are (1) how many individuals need to be on the sidewalk to convey Dignity's message and the Committee's messages with some impact to the line of marchers and to the public, and (2) how can the size, positioning, and timing of these competing groups be accommodated to legitimate public safety concerns.

*Olivieri*, 801 F.2d at 607.

Finding that "both groups are entitled to be present before the St. Patrick Cathedral during the Gay Pride Parade," the court concluded that each group would be permitted to demonstrate for thirty minutes with twenty-five of its members and separated the two demonstrations by thirty minutes. *Olivieri*, 801 F.2d at 606–608.

*Olivieri* illustrates that a court has the power to provide guidelines for a city and demonstrators both to protect First Amendment rights and maximize public safety. Therefore, the Court offers the following guidelines for the plaintiffs, the defendants and future protest groups.

The defendants may not insert any unwanted group at any point of the Council's Parade. Protest groups are allowed to gather on the sidewalks provided that they do not disrupt the flow of traffic or endanger public safety. See *Cox v. New Hampshire*, 312 U.S. 569, 574, 61 S.Ct. 762, 85 L.Ed. 1049 (1941) (stating that municipalities have the authority to impose regulations to "assure the safety and convenience of the people in the use of public highways"). The protest groups may not interfere with the Parade or the permitted area, including marching behind the Parade. If protest groups desire to march then they must go through the same permit process as does the Council.

> The obvious advantage of requiring application for a permit was noted as giving the public authorities notice in advance so as to afford opportunity for proper policing. . . . [I]n fixing time and place, the license served "to prevent confusion by overlapping parades or processions, to secure convenient use of the streets by other travelers, and to minimize the risk of disorder."

*Cox v. State of New Hampshire*, 312 U.S. 569, 576, 61 S.Ct. 762, 85 L.Ed. 1049 (1941).

### D. The Remedy for the Future

■ It is in the defendants' discretion to determine if they have the necessary resources to support two different parades in order to ensure public safety. See, e.g., *Grider v. Abramson*, 180 F.3d 739 (6 Cir.) (creating buffer zones and using metal detectors to address public safety concerns because of two competing rallies), cert. denied, *Grider v. City of Louisville*, 528 U.S. 1020, 120 S.Ct. 528, 145 L.Ed.2d 409 (1999). However, if this option is pursued,

there must be sufficient distance between the two parades so as to distinguish the message each is to convey. This separation does not require that the St. Patrick's Day crowd have totally dispersed before another group may march on the same route. In the Court's view, an adequate distance between two parades would be at least one mile. I rule that that distance must be maintained by city officials. The defendants may increase this distance if it is necessary to ensure public safety, but the distance must be no less than a mile so as to distinguish the two sets of speech.

### IV. Conclusion

For the reasons stated, this Court holds that the defendants violated the Council's First Amendment rights when the BPD placed the Protest Group at the end of the Parade. Judgment shall enter permanently enjoining the City from allowing (by permit or otherwise) future groups who wish to march at the end of the Parade to do so less than one mile behind the sweepers at the end of the Council's Parade. Finally, this Court awards nominal damages in the amount of one dollar ($1.00) to the Council and attorneys' fees associated with this matter. Counsel shall agree on the form of the judgment to be entered by the Court which shall include the permanent injunction and the award of nominal damages; counsel shall file the agreed-upon form of judgment on or before the close of business on Tuesday, January 6, 2004. A later separate judgment on the issue of attorney's fees shall enter when the fees are determined.