819 F.2d 289
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Kay BISHOP; Shirley Rosser; Mary Luken; Lois Gish; Maria
Pesante; Phillip W. Amadon; Susan E. Binder;
Jonathan Messinger; Ruth Rucker;
Andrew Rucker; Benjamin
Rucker, Plaintiffs-Appellants,
v.
REAGAN-BUSH '84 COMMITTEE; Mark Hatfield, Jr.; James Kuhn;
William Brennan; Michael Murphy; John Does 1-20;
Lawrence Whalen; Richard Roe 1-20 Police Officers;
Hamilton County Reagan-Bush '84; John Collins; Anthony
Reissig; John Doe 1-20 Republican Party Volunteers,
Defendants-Appellees.
 No. 86-3287.
 United States Court of Appeals, Sixth Circuit.
 May 22, 1987.
 
 Before ENGEL and GUY, Circuit Judges, and PECK, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 This appeal arises out of an incident which occurred at a political rally for President Reagan held in Cincinnati, Ohio, on August 20, 1984. The district court granted summary judgment to all the named defendants on the ground that the exclusion of all signs and banners critical to the President or his policies from a rally held pursuant to a validly-issued permit was not violative of plaintiffs' first amendment rights. Because we conclude that the analysis used by the district court was improper and the grant of summary judgment premature, we reverse and remand for further proceedings consistent with this opinion.
 
 I.
 
 2
 On August 16, 1984, the Reagan-Bush '84 Committee secured a permit for the use of Fountain Square, an outdoor public meeting place in downtown Cincinnati, for the purpose of conducting a presidential rally. The permit was issued pursuant to Chapter 713 of the Cincinnati Municipal Code, which specifically provides that "[t]he use of Fountain Square shall be preserved primarily for the peaceful and orderly enjoyment of the square ... by the general public." Sec. 713-1. However, the City does allow, pursuant to permit, special group uses of the Square which may entail "unreasonable interference or obstruction with the rights of the public to peaceably use and enjoy Fountain Square," Sec. 713-1. (c), for "reasonable" periods of time, subject to certain enumerated safety and traffic concerns. Sec. 713-1. (c)(1)-(3). President Reagan was to be the featured speaker at this pre-election rally, to which public attendance was encouraged.
 
 
 3
 On the day of the rally, security personnel, apparently consisting of certain Secret Service agents, various members of the Cincinnati police force, as well as various members of both the national and local Reagan-Bush '84 Committees, set up checkpoints through which all persons wishing to attend were required to pass. These checkpoints consisted of specific gates at which metal detectors were located, maintained to ensure the safety of the President who was, at that time, running for re-election. It is alleged by plaintiffs that before being allowed past these checkpoints, all persons carrying signs, whether in favor of or against the President, were required to abandon those signs as a condition of entering the rally. Some plaintiffs carried signs expressing opposition to President Reagan's candidacy; others brought signs expressing opposition to various political and social policies identified with the Reagan administration; and others brought signs which addressed public issues not specifically identified with the Reagan administration. When plaintiffs attempted to enter the Square, they were required to surrender their signs as a condition of entry. However, immediately past the checkpoint entrances, individuals who entered the Square were offered miniature American flags attached to sticks and cardboard signs promoting the Reagan-Bush ticket. Plaintiffs allege that no one was permitted to display any sign critical of the President or his ticket.
 
 
 4
 Eleven days after this event, plaintiffs filed this suit requesting injunctive relief and damages for alleged constitutional violations directly under the first and fourth amendments by the Secret Service defendants (a Bivens action);[1] conspiracy to deny plaintiffs their first and fourth amendment rights in violation of 42 U.S.C. Sec. 1985 by all defendants; and violation of their first, fourth, and fourteenth amendment rights under color of state law in violation of 42 U.S.C. Sec. 1983 by the individual Cincinnati Police Department defendants and by the Reagan-Bush '84 Committee acting in concert with the local police. Due to the passage of time, the request for injunctive relief has been mooted and only the claims for damages remain.
 
 
 5
 Pursuant to certain agreements between the parties on the requested injunctive relief and motions to dismiss by the various defendants based on failure to state a claim or asserting the defense of qualified immunity, the trial judge issued a blanket protective order prohibiting the plaintiffs from engaging in discovery until those motions were ruled on. All defendants (the Secret Service agents, members of the Cincinnati police force, and members of the national and Hamilton County Reagan-Bush '84 Committees) filed motions to dismiss plaintiffs claims; in addition, Secret Service agent Michael Murphy filed an "alternate" motion for summary judgment, to which he attached an affidavit declaring that at no time on the date in question did he supervise the admittance of persons into Fountain Square. Plaintiffs allege that, while this protective order was still in effect, thereby precluding them from conducting any discovery whatsoever, the trial judge entered an order purporting to grant all the defendants' motions for summary judgment and dismissing plaintiffs' claims.
 
 
 6
 The judge's ruling was predicated upon a detailed analysis of the physical characteristics of Fountain Square. He pointed out that entrance to the Square was "limited" by certain boundaries; e.g., commercial buildings along two sides and a sloping terrain along the other two sides which is blocked in places by bushes, trees, and a low wall. Bishop v. Reagan-Bush '84 Committee, 635 F.Supp. 1020, 1021-22 (S.D.Ohio 1986). He also observed that "[o]nly the entrance from Sixth Street is at ground level, two others contain an inclined ramp and the remaining four have steps." Id. He concluded that "[f]or purposes of crowd control, the limited access to and exit from the plaza area of Fountain Square Plaza would more resemble a hall for performers than it would an open field or area." Id. at 1022. Based on this conclusion, the judge found that issuance of the permit conferred on the defendants the right to exclusive use of the Square with the concomitant right to place whatever conditions they desired on the rights of those attending their "private" function.
 
 II.
 
 7
 At the outset, we reject an analysis of this question which turns solely on the physical characteristics of Fountain Square. Such analysis gives no consideration to the possibility that the nature of certain public forums cannot be altered, either by governmental fiat or private will. Even if Fountain Square is not such a forum, the record is inadequate at this stage of the proceedings as to the City's intent in issuing the permit for this political rally.
 
 
 8
 Analysis of the first amendment questions involved in this case must proceed according to the most recent pronouncements from the Supreme Court in Cornelius v. NAACP Legal Defense & Education Fund, 473 U.S. 788 (1985). See also Perry Education Assn. v. Perry Local Educators' Assn., 460 U.S. 37 (1983).[2] First, the "relevant forum" must be ascertained. Cornelius, 105 S.Ct. at 3448. Having defined the relevant forum, the court must then determine its nature, since the extent to which access may be limited depends on whether the forum is public or nonpublic. Id. at 3446-47. Finally, the proffered justifications for the exclusion from the relevant forum must be assessed to determine whether they satisfy the requisite standard. Id. at 3447.
 
 
 9
 The Court has identified three types of fora: traditional, limited, and nonpublic. If the property is determined to be a traditional public forum, "the government's ability to permissibly restrict expressive conduct is very limited; the government may enforce reasonable time, place, and manner regulations as long as the restrictions 'are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.' " United States v. Grace, 461 U.S. 171 (1983), quoting Perry Education Assn., 460 U.S. at 45. See also, Jews for Jesus, Inc. v. Board of Airport Commissioners, 785 F.2d 791 (9th Cir.1986), cert. granted, 107 S.Ct. 61 (1986).
 
 
 10
 A limited public forum will be found when government property not normally open to the general public is opened temporarily or for a special purpose. See Perry Education Assn., 460 U.S. at 45-46 and n. 7. In such a forum, there exists a need to confine expressive activity to that which is compatible with the intended use(s) of the property. However, "[a]lthough a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum." Id. at 46.
 
 
 11
 If, however, the forum is found to be nonpublic, "[t]he Government's decision to restrict access ... need only be reasonable; it need not be the most reasonable or the only reasonable limitation." Cornelius, 105 S.Ct. at 3453 (emphasis in original). But "[t]he existence of reasonable grounds for limiting access to a nonpublic forum ... will not save a regulation that is in reality a facade for viewpoint-based discrimination." Id. at 3454.
 
 
 12
 On remand, the City's intent with respect to any transformation of Fountain Square by virtue of the issuance of the permit must be determined. If it was not the City's intent to convert the Square into a private forum, the court must address other issues, such as the existence or lack of state action and qualified immunity, raised by the defendants. If the court finds that it was the City's intent to confer exclusive use of the forum to Reagan-Bush '84, it must resolve the question of whether they had the power to do so.[3]
 
 
 13
 Nothing in this opinion should be taken to preclude the subsequent grant of either partial or complete summary judgment for any party after full development of the facts and the analysis we have outlined.
 
 
 14
 REVERSED and REMANDED.
 
 
 
 [1]
 See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971)
 
 
 [2]
 While Cornelius and Perry set forth the appropriate analytical framework, they are otherwise of very limited usefulness since neither deals with the permissible limits on free speech in a traditional public forum
 
 
 [3]
 Compare Community for Creative Non-Violence v. Hodel, 623 F.Supp. 528 (D.C.D.C.1985), where the court applied a restrictive view of the "relevant forum" which allowed it to conclude that an otherwise public forum had been converted, partially by virtue of a permit, into a nonpublic forum, with Irish Subcommittee v. Rhode Island Heritage Commission, 646 F.Supp. 347 and 353 n. 3 (D.R.I.1986), in which the court disapproved of the District of Columbia court's analysis, stating: "I cannot accept [the court's] premise which treated the Christmas Pageant as though it was to be held on nonpublic forum property and then examined the access which had been granted. To allow the government to limit traditional public forum property and thereby create within it a nonpublic forum would destroy the entire concept of a public forum." Id