**H. Paul SCHWITZGEBEL,
et al., Plaintiffs,**

v.

**CITY OF STRONGSVILLE,
et al., Defendants.**

No. 1:94CV757.

United States District Court,
N.D. Ohio,
Eastern Division.

Aug. 28, 1995.

William M. Saks, American Civil Liberties Union Of Ohio Foundation, Cleveland, OH, Alfred R. Cowger, Jr., Cleveland, OH, for H. Paul Schwitzgebel, James E. DeLong.

John Thomas McLandrich, Todd M. Raskin, Kimberly A. Brennan, Mazanec, Raskin & Ryder, Solon, OH, John D. Ryan, Office Of The Law Director, City of Strongsville, Strongsville, OH, for City of Strongsville, OH, Walter F. Ehrnfelt, Lee J. Colegrove, David Tomcho, Todd Shaw, Pamela Stephan, Robert Satterwaite.

Dennis B. Ehrie, Scott W. Spencer, Spencer & Ehrie, Columbus, OH, Michael E. Murman, Murman & Associates, Lakewood, OH, for Ohio Republican Party.

## MEMORANDUM & ORDER

O'MALLEY, District Judge.

The two plaintiffs in this case, James De-Long and H. Paul Schwitzgebel, are both individuals who attended a presidential campaign rally held by the Bush–Quayle '92 Committee, Inc. The rally was held on the grounds of the Public Commons of the City of Strongsville, Ohio on October 28, 1992. At the rally, the plaintiffs held up signs protesting then-President George Bush's supposed inaction on the issues of AIDS research and funding. After a brouhaha ensued, plaintiffs were arrested. The charges against plaintiffs were eventually dropped.

Plaintiffs then filed this case, naming the following parties as defendants: (1) the City of Strongsville ("the City"); (2) Strongsville Mayor Walter Ehrnfelt, in both his individual and official capacities ("the Mayor"); (3) the Cuyahoga County Republican Central Committee; (4) the Bush–Quayle '92 Committee, Inc.; and (5) the five Strongsville police officers who were involved in the arrest of plaintiffs, in both their individual and official capacities ("the Police Officers").[1] In their first amended complaint, plaintiffs claim that defendants violated their First Amendment and Sixth Amendment rights under color of state law, in violation of 42 U.S.C. § 1983, and also claim that defendants are liable for false arrest under Ohio law.

The Bush–Quayle '92 Committee filed a motion to dismiss, and this Court granted that motion on October 13, 1994. The Cuyahoga County Republican Central Committee also filed a motion to dismiss, and this Court granted that motion on October 17, 1994.[2]

Subsequently, the remaining defendants filed a motion for summary judgment (docket no. 51). In response, plaintiffs filed a memorandum captioned "Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment, Motion for Reconsideration, Voluntary Dismissal of Sixth Amendment Claim, and Motion for Leave to File Brief Beyond Page Limitation" (docket no. 58). The Court frowns on such combinations and urges counsel to separate its motions from each other and from memoranda in response or reply. In any event, the Court rules on these two docket entries as follows:

1. plaintiffs' motion to voluntarily dismiss their Sixth Amendment claims (docket no. 58)[3] is **GRANTED;**

2. plaintiffs' motion for leave to file a brief in excess of the page limitation (docket no. 58) is **GRANTED;**

3. plaintiffs' motion for reconsideration of the Court's Orders dismissing defendants Cuyahoga County Republican Central Committee and Bush–Quayle '92 Committee, Inc. (docket no. 58) is **DENIED;** and

4. defendants' motion for summary judgment on plaintiffs' First Amendment claims (docket no. 51) is **GRANTED.** The plaintiffs' remaining state law claims for false arrest are dismissed without prejudice.

Further, given the Court's grant of the remaining defendants' motion for summary judgment, which disposes of this case in its entirety, the outstanding motions for certification of the Court's earlier Orders (docket nos. 52 and 57) are **DENIED** as moot. For the same reason, defendants' supplemental motion for summary judgment (docket no. 63) and plaintiffs' motion to strike the supplemental motion (docket no. 66) are also **DENIED** as moot.

### I.

The following material facts are not in dispute. On October 28, 1992, the Bush–Quayle '92 Committee ("the Committee")

---

**1.** These Police Officers are Lee Colegrove, David Tomcho, Todd Shaw, Pamela Stephan, and Robert Satterwaite.

**2.** The basis for the Court's dismissal of the claims against the Cuyahoga County Republican Central Committee and the Bush–Quayle '92 General Committee was that these two defendants are both private entities, which were not acting under color of state law. The Orders dismissing the claims against these two defendants were entered by Judge Paul Matia, before the case was transferred to the docket of Judge Kathleen O'Malley.

**3.** The Clerk of Courts should note that this motion was originally filed as docket no. 55, and then corrected and filed again as docket no. 58.

held a campaign rally in the Public Commons of the City of Strongsville, Ohio. The rally was authorized by a permit granted by the Mayor on October 27, 1992, in exchange for one dollar. The permit stated that "the use of [the Commons] shall be limited to the members of the [Strongsville Republican Organization] and their invitees who are holders of an invitation and the [Strongsville Republican Organization] is authorized to further restrict the use of the premises by category of invitation." On its application for the permit, the Strongsville Republican Organization stated that it expected about 10,000 people would attend the rally.

Before the rally took place, flyers were distributed announcing the rally. Across the top of the flyers was printed:

MAYOR WALTER F. EHRNFELT INVITES YOU TO COME AND SEE ... PRESIDENT GEORGE BUSH.

(Ellipsis in original). Tickets were also distributed, across the top of which was printed:

ADMIT ONE FAMILY

Mayor Walter F. Ehrnfelt

and the Republican Party

invite you to see and hear

PRESIDENT GEORGE BUSH

and the Oak Ridge Boys at

Strongsville Commons

It is not clear how these tickets were distributed, but apparently they were generally available to anybody who wanted one. For example, any student from the Strongsville High School who wished to attend the rally was permitted to leave school and transported to the Commons on City school buses.

As might be expected, the Strongsville Police Department made special preparations for the rally. The Strongsville Chief of Police placed defendant Sergeant Satterwaite in charge of a team of officers assigned to patrol the Commons. The police officers were also specifically directed to provide assistance to the federal Secret Service. Included on the team of police officers supervised by Satterwaite were defendants Stephan, Shaw, and Tomcho.

On the day of the rally, plaintiffs DeLong and Schwitzgebel went to the Strongsville Commons, bearing tickets. The Commons was surrounded by fencing, with gates through which all attendees had to pass. At each gate was stationed one Secret Service officer and one uniformed Strongsville police officer. The two lawmen at each gate examined all prospective attendees for items that might pose security risks. The officers generally forbade entrance to prospective attendees who were carrying lawn chairs, umbrellas, placards on sticks, and certain other personal property. Prospective attendees were also generally forbidden entrance if they were carrying any signs or wearing any buttons, even signs and buttons supportive of the Bush–Quayle ticket. Individuals were allowed inside the fenced area only if they agreed to leave any offending personal property at the gate. It is questionable whether the requirement that attendees not bring their own posters into the fenced area was really enforced for reasons of security: once inside the fenced area, placards saying "BUSH QUAYLE 92" or "BUSH" were made available to attendees. One result of this policy, of course, was to homogenize the display of placards held aloft by the crowd.

Both plaintiffs passed through the security check at the gate and were admitted into the fenced area. Although they had admission tickets, plaintiffs were not asked to present them. The security check did not uncover two small signs that plaintiffs had somehow concealed, and the plaintiffs carried these signs into the fenced area.

Upon gaining entrance to the restricted area, plaintiffs held up their signs. One of the signs stated: "The Government Has Blood On Its Hands! One AIDS Death Every 10 Minutes." The second sign contained a message printed over a picture of President Bush, reading: "1,500,000 DEAD FROM AIDS. STOP THIS MONSTER! ACT UP." Shortly after plaintiffs held their signs aloft, a small ruckus ensued. It is unclear exactly what happened, but it appears plaintiffs were surrounded by other rally attendees, who tried to block plaintiffs'

signs with their own "BUSH" and "BUSH QUAYLE 92" signs. Amidst some pushing and shoving, one crowd member snatched DeLong's poster. Whether by chance or design, the squabble occurred near an area reserved for the press, and members of the press soon arrived and began to interview plaintiffs.

Officers Shaw and Tomcho were patrolling the Commons when they received a call from the Secret Service asking them to respond to a disturbance near the press area. The police officers arrived while plaintiffs were being interviewed. Officers Shaw and Tomcho proceeded to arrest plaintiffs and took them to the Strongsville Police Station. Photographs reveal that plaintiff Schwitzgebel was still carrying his sign as he was removed by the police, although Officers Shaw and Tomcho assert Schwitzgebel threw his sign into the crowd, after they told him he was under arrest. Officer Stepanovich states he received a radio report (which proved to be false) that two AIDS activists were sticking people with needles and had been arrested. Stepanovich went to the police station, observed the plaintiffs being booked and put in jail, and then returned to the rally.

As a result of their actions at the rally, plaintiffs were charged with various misdemeanor offenses. Later, all of these charges were dropped. Plaintiffs then filed this law suit. Based on these undisputed facts, the City, the Mayor, and the Police Officers (that is, all of the remaining defendants) now seek summary judgment.

## II.

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law....

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.... The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.,* 909 F.2d 941, 943–44 (6th Cir.1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is enti-

tled to a verdict." *Id.* at 252, 106 S.Ct. at 2512.

■ Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989) (citing *Frito–Lay, Inc. v. Willoughby,* 863 F.2d 1029, 1034 (D.C.Cir.1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus,* 801 F.Supp. 1, 4 (S.D.Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

### III.

In their motion, defendants[4] raise two grounds for summary judgment. First, defendants insist that they did not violate plaintiff's First Amendment rights. Second, defendants claim that they took no action under color of state law. In their reply brief, defendants add the additional grounds that in their individual capacities they are immune from liability to plaintiffs, and the plaintiffs have failed to state a claim against them in their official capacities. The Court examines only defendants' first argument, which is the most fully briefed.

■ The analytical framework this Court must apply in analyzing the relevant issues, on the facts of this case, has been set out by the Sixth Circuit in *Bishop v. Reagan–Bush '84 Comm.,* 819 F.2d 289, 1987 WL 35970 (6th Cir.1987) (table; available at 1987 WL 35970, 1987 U.S.App. LEXIS 6669) (reversing *Bishop v. Reagan–Bush '84 Comm.,* 635 F.Supp. 1020 (S.D.Ohio 1986)). The facts of *Bishop* are similar to those of this case—the plaintiffs were required to relinquish their placards before attending a political rally on the public commons known as Fountain Square Plaza in Cincinnati, Ohio. Although the *Bishop* plaintiffs were not arrested, they claimed that their First Amendment rights had been violated. In assessing this First Amendment claim, according to the Sixth Circuit, "[f]irst, the 'relevant forum' must be ascertained" under the guidelines set out by the Supreme Court in *Cornelius v. NAACP Legal Defense and Educ. Fund,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) and *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). *Bishop,* 819 F.2d 289, 1987 WL 35970 at *3, 1987 U.S.App. LEXIS 6669 at *6. "Having defined the relevant forum, the court must then determine its nature, since the extent to which access may be limited depends on whether the forum is public or nonpublic." *Id.,* 819 F.2d 289, 1987 WL 35970 at *3, at *6–7. The *Bishop* court indicated that whether a traditionally public forum is indeed public or nonpublic requires an examination of

the City's intent with respect to any transformation of [the forum] by virtue of the issuance of [a] permit.... If it was not the City's intent to convert the [forum] into a private forum, the court must address other issues, such as the existence or lack of state action and qualified immunity, raised by defendants. If the court finds that it was the City's intent to confer exclusive use of the forum to [the permittee], it must resolve the question of whether they [sic] had the power to do so.

*Id.,* 819 F.2d 289, 1987 WL 35970 at *3–4, at *8–9. Then, "[f]inally, the proffered justifications for the exclusion from the relevant forum must be assessed to determine whether they satisfy the requisite standard." *Id.,* 819 F.2d 289, 1987 WL 35970 at *3, at *7. It is this analysis that the Court applies below.

### A. *The Nature of the Relevant Forum.*

There is no dispute that the relevant forum in this case is the area of the Strongsville

---

4. In the remainder of this memorandum, "defendants" refers only to the defendants currently remaining in this case (the City, the Mayor, and the Police Officers), unless otherwise noted.

Public Commons that was fenced in on October 28, 1992. It is that area into which plaintiffs entered for the purpose of expressing their views and from which plaintiffs were forcibly removed after they did so.

■ Nor is there any dispute that all of the Strongsville Public Commons, including the fenced in area, is a traditional public forum—precisely that sort of place which "immemorially [has] been held in trust for the use of the public and, time out of mind, [has] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. C.I.O.,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939).

There is a dispute, however, regarding the nature of this relevant forum. The parties disagree over whether the City intended to change the Commons into a non-public forum during the campaign rally on October 28, 1992, and, if the City did have this intent, whether it had the right to do so.

The only evidence presented by the parties regarding the City's intent is contained in the permit. As noted earlier, the permit was issued with the following "special instructions:" "the use of [the Commons] shall be limited to the members of the [Strongsville Republican Organization] and their invitees who are holders of an invitation and the [Strongsville Republican Organization] is authorized to further restrict the use of the premises by category of invitation." These instructions evidence a clear intent to allow access to the Commons to be controlled by a private entity. Allowing access to the forum to be controlled by a private entity reveals, in turn, an intent to make the Commons itself less than fully public: use of the Commons is "limited" to those whom the permittee extends an invitation. Moreover, under the "category of invitation" language, the permittee is apparently authorized by the City to make certain areas of the Commons even more exclusive than other areas. For example, the permittee is apparently allowed to invite the general public into the fenced-in area, but restrict the vicinity near the rostrum to very important persons. Thus, construing the evidence in a light most favorable to plaintiffs, the Court must conclude that the City intended to transform the Commons into a less-than-public forum.

It should be noted that the methods by which the permittee *actually* exercised the authority given to it by the City through the permit is immaterial to the City's intent. Under the permit, the permittee had the authority to exclude the entire universe by denying anyone and everyone an invitation. Conversely, the permittee could ultimately chose to invite the general public into every part of the Commons without restriction, thereby giving the public as much access to the Commons as it would enjoy absent the permittee's authority to exclude. But the critical element is that the City clearly *intended* to give the permittee the right to exclude persons as it saw fit. Thus, the City intended to change temporarily the Commons into a non-public forum. Arguably, the City so intends with the issuance of any and every permit.

The next question is whether the City had the power to transform a traditionally public forum into a non-public forum, through issuance of a permit. The Sixth Circuit chose not to answer this question itself in *Bishop,* noting simply that courts have disagreed on this question. *Bishop,* 819 F.2d 289, 1987 WL 35970 at *3 n. 3, 1987 U.S.App. LEXIS 6669 at *9 n. 3. The *Bishop* court's observation on this point is certainly accurate. In *Community for Creative Non–Violence v. Hodel,* 623 F.Supp. 528 (D.D.C.1985), the court ruled that the National Park Service could exclude the plaintiff's Christmas statue from display in the Christmas Pageant of Peace on the Washington, D.C. ellipse. The Park Service had excluded the statue, which depicted a homeless man sleeping on a heating grate, because it was too controversial. The *Hodel* court upheld the Park Service's action on the basis that the portion of the ellipse holding the Christmas displays was not a public forum. The court essentially ruled that because the Park Service consistently limited access to the Pageant area, that territory was not a public forum.

■ In *Irish Subcommittee v. Rhode Island Heritage Comm'n,* 646 F.Supp. 347 (D.R.I.1986), however, the court strongly dis-

agreed with the analysis of the *Hodel* court. In *Irish Subcommittee,* a plaintiff wished to distribute political literature at a festival held on the Rhode Island State House lawn. The plaintiff was told he could not distribute his literature because the annual festival was meant only to celebrate ethnic diversity and promote brotherhood, and to avoid the sort of community divisiveness that plaintiff's literature might foster. The court granted summary judgment to plaintiff, ruling that the festival took place in a public forum. The court stated, in contrast to *Hodel:*

> To allow the government to limit traditional public forum property and thereby create within it a nonpublic forum would destroy the entire concept of a public forum. If a court is to focus only upon the limits to access of a subpart of the public forum, the government will be able to create a private forum out of the public forum at will, merely by imposing such limits. I cannot accept that the government may so easily alter the character of public forum property by restricting the use of part of the public forum. It is the restriction itself which must first survive judicial scrutiny.

*Irish Subcommittee,* 646 F.Supp. at 354 n. 3. *Cf. U.S. Postal Service v. Council of Greenburgh Civic Ass'ns,* 453 U.S. 114, 133, 101 S.Ct. 2676, 2687, 69 L.Ed.2d 517 (1981) ("Congress, no more than a suburban township, may not by its own ipse dixit destroy the 'public forum' status of streets and parks which have historically been public forums"); *see also Capitol Sq. Review Bd. v. Pinette,* — U.S. —, —, —, 115 S.Ct. 2440, 2446, 2444, 132 L.Ed.2d 650, 660, 658 (1995) (ruling that "private expression" in a public forum is protected under the First Amendment, so long as such expression meets permit requirements of "non-interference with other uses of the [forum]").

█ This Court agrees with the view expressed in *Irish Subcommittee.* The Supreme Court has recognized the existence of public fora as surpassingly important in giving substance to the First Amendment. "[A] principal purpose of traditional public fora is the free exchange of ideas," a bedrock ideal upon which our Republic was founded. *Cornelius,* 473 U.S. at 800, 105 S.Ct. at 3448. To allow the government to transform a traditionally public forum into a non-public forum is to allow the government to suspend, if only temporarily, the existence of an historically protected arena used to safeguard the communication of thoughts between free citizens. In essence, public fora serve as bulwarks protecting the right of all persons, especially those who have no access to any other outlet, to speak their minds freely. Courts must not allow the government to overcome the bastions protecting such an important right through so simple an exercise as the granting of a permit. Thus, this Court concludes that: (1) the relevant forum in this case, the fenced-in area of the Strongsville Public Commons, is a public forum; and (2) regardless of whether the City intended to transform the Strongsville Public Commons into a non-public forum, the Commons *remained* a public forum during its use, pursuant to permit, by the Strongsville Republican Organization on October 28, 1992.[5]

### B. Defendants' Justifications For Exclusion Of Plaintiffs From The Relevant Forum.

█ Having determined the nature of the relevant forum, the Court must next assess the defendants' proffered justifications for their exclusion of plaintiffs from the forum, and then determine whether those justifications satisfy the requisite standard. *Bishop,* 819 F.2d 289, 1987 WL 35970 at *3, 1987 U.S.App. LEXIS at *7. The requisite standard for exclusion of a putative speaker from a public forum is well known. Because public fora are so important as instruments for actualizing the ideals of the First Amend-

---

5. The Court recognizes that this conclusion renders superfluous at least part of the analysis set forth in *Bishop.* The intent of the governmental entity regarding the transformation of a public forum into a semi-public or private forum becomes irrelevant; if no such conversion can occur, it matters not what the governmental body intended. By expressly leaving open the question of whether a governmental body has the authority to effect the transformation of a public forum into a non-public forum, however, *Bishop* contemplates this result. Hence, it is this Court's view that its conclusion on this point is not at odds with the Sixth Circuit's analysis in *Bishop,* and is, in fact, true to it.

ment, the Supreme Court has ruled that "speakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Cornelius*, 473 U.S. at 800, 105 S.Ct. at 3448. In public fora, "the government's ability to permissibly restrict expressive conduct is very limited; the government may enforce reasonable time, place, and manner regulations as long as the restrictions 'are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'" *United States v. Grace*, 461 U.S. 171, 177, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983) (quoting *Perry Educ. Ass'n*, 460 U.S. at 45, 103 S.Ct. at 955).

 Although governments are limited in their ability to restrict expressive conduct, "[p]ermit systems are the embodiment of time, place, and manner restrictions that have long enjoyed the approbation of the Supreme Court." *Kroll v. U.S. Capitol Police*, 847 F.2d 899, 903 (D.C.Cir.1988) (citing, inter alia, *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1980); *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); and *Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941)). The Supreme Court has rejected the assertion that people who wish "to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please." *Adderley v. Florida*, 385 U.S. 39, 48, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966). One of the most important reasons behind allowing for government-sponsored permit systems is to prevent a multitude of individuals with different messages from expressing their views simultaneously, resulting in a cacophony where no one's message is heard. Indeed, absent a permit system, an individual could exercise his right to voice his opinion solely for the purpose of drowning the voice of another. Exercise of First Amendment rights to achieve this objective is not constitutionally protected: "the right of free speech ... does not embrace a right to snuff out the free speech of others." *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 387, 89 S.Ct. 1794,

1805, 23 L.Ed.2d 371 (1969). *See also Cox v. Louisiana*, 379 U.S. 536, 554, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965) ("[t]he rights of free speech and assembly ... do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time" because "the constitutional guarantee of liberty itself ... would be lost in the excesses of anarchy").

 Before returning to the facts of this case and applying the above-cited legal standards, the Court notes that it is not the first to address the issues raised by plaintiffs. The reasoning contained in an opinion by another court, which addressed the same issues and applied the same standards, is so helpful that the Court first quotes it extensively:

> The issue presented here is thus relatively narrow: did plaintiff, in the exercise of his constitutional freedoms, have a right to express his views by intruding within an area reserved for another event still in progress? Plaintiff contends defendants could only prohibit his expression if it unreasonably interfered with the preexisting event, while defendants respond that they have the authority to stop all intrusions into a reserved area, regardless of the level of interference. Resolution of this dispute turns upon whether defendants' time, place, and manner restrictions on plaintiff's exercise of his First Amendment rights are reasonable and serve a significant government interest. *See, e.g., Heffron v. International Society of Krishna Consciousness, Inc.*, [452 U.S. 640, 647–48, 101 S.Ct. 2559, 2563–64, 69 L.Ed.2d 298 (1981) ]; *Adderley v. Florida*, [385 U.S. 39, 47–48, 87 S.Ct. 242, 247–48, 17 L.Ed.2d 149 (1966) ].
>
> The government interest here is twofold. The first concerns the safety, order, and convenience of those other citizens already participating in the preexisting event. In evaluating the justification for a regulation of the type at issue, the Court should not assess only the impact which would be caused by one party before the Court, but rather the impact which would be caused by all persons who would wish to invoke

the right. *Krishna*, [452 U.S. at 652, 101 S.Ct. at 2566]. Seen in this light the justification is not the discrete impact of plaintiff's demonstration, it is the cumulative impact which would be caused by the presence of the many single and peaceful demonstrators who might choose to intrude upon ongoing events. *Id.* at [652–54, 101 S.Ct. at 2566–67]. The Court finds that the confusion and disorder that could be caused by allowing all single, peaceful intrusions is significant enough to support defendants' policy of excluding such intrusions.

Secondly, and more fundamentally, is the interest in guaranteeing citizens the right to participate in events or demonstrations of their own choosing without being subjected to interference by other citizens. A physical intrusion into another event for the purpose of interjecting one's own convictions or beliefs is by definition an interference, regardless of how insubstantial or insignificant it might appear. As such, it is an interference with the rights of other citizens to enjoy the event or demonstration in which they have chosen to participate, and in an area reserved for them.... Plaintiff had an undeniable right to express his views, whatever they were, but not in an area set aside for another event where his intrusion would be an interference.

*Sanders v. United States*, 518 F.Supp. 728, 729–30 (D.D.C.1981), *aff'd without op.*, 679 F.2d 262 (D.C.Cir.1982).

This Court finds the *Sanders* court has accurately described the analysis dictated by First Amendment jurisprudence emanating from the Supreme Court. Applying the *Sanders* court's reasoning here, this Court also finds that the defendants in this case did not violate plaintiffs' First Amendment rights. As noted, the defendants "may enforce reasonable time, place, and manner regulations as long as the restrictions 'are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communications.'" *United States v. Grace*, 461 U.S. 171, 177, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983) (quoting *Perry Educ.*

*Ass'n*, 460 U.S. at 45, 103 S.Ct. at 955). Addressing these requirements in reverse order, it is clear that defendants' enforcement of their permit system left open ample alternative channels of communication to plaintiffs. The plaintiffs "presumably would have had a fair shot ... at obtaining a ... permit of [their] own" to broadcast their message in the Strongsville Commons at another time. *Hurley v. Irish–American Gay, Lesbian & Bisexual Group of Boston*, —— U.S. ——, ——, 115 S.Ct. 2338, 2349, 132 L.Ed.2d 487, 506 (1995). Furthermore, plaintiffs were "certainly permitted to shout on the adjoining sidewalks;" it is only that area of the Commons reserved to the Strongsville Republican Organization by the permit that was, although a public forum, temporarily off limits. *Invisible Empire of the Knights of the Ku Klux Klan v. Mayor*, 700 F.Supp. 281, 290 (D.Md.1988). No factfinder could reasonably conclude that defendants' enforcement of their permit system failed to leave open ample alternative channels of communications.

The Court also finds that the permit system is narrowly tailored to serve significant government interests. These interests were identified in *Sanders:* (1) protecting the safety of the speaker who sought and obtained the permit, and the citizens who wished to hear him; and (2) protecting the citizens' and speaker's right to exercise their own First Amendment rights of free speech and assembly, without interference. Defendants' *enforcement* of the permit (as opposed to its *issuance*), of course, is required for vitalizing these protections and giving the permit meaning.

Finally, the Court finds that the restrictions upon the plaintiffs and the public created by the defendants' operation and enforcement of the permit system were content neutral. It is this constitutional requirement that plaintiffs challenge most strongly. Plaintiffs argue that, if they had been expressing a message favorable to then-President Bush, they would not have been arrested; they conclude that their arrest was, ipso facto, dependent solely on the content of their posters. This argument fails. As ex-

plained in *Kroll v. U.S. Capitol Police,* 847 F.2d 899, 903 (D.C.Cir.1988):

> Judgments about the message being conveyed by a particular demonstrator, a reasonable officer could have concluded, are inherent in the implementation of a permit system. Otherwise, the [defendants] would have been authorized to issue permits, but do nothing when counterdemonstrators chose to intrude into the area of the "permitted" activity and carry on their efforts to communicate a different (or indeed possibly conflicting) message.

The *Kroll* court concluded: "[t]he principle of content neutrality does not, in sum, mean that a permit system exists only as an office operation without enforcement capability." *Id.* In other words, content-neutrality must govern the *issuance* of permits but, once issued, the permits may be *enforced* in a way that protects the expression of the permitted message, even to the exclusion of some other message.

■ Plaintiffs have not adduced any evidence, nor even made allegations, suggesting that the defendants operate the "office" portion of the permit system for using the Strongsville Public Commons in a way that limits or disfavors the expression of certain messages. Indeed, plaintiffs have not adduced any significant evidence that the "enforcement" portion of the permit system limited or disfavored any given "non-permitted" message more than any other "non-permitted" message. Simply, the Court finds that the answer to "[t]he controlling inquiry ... [of] whether the government has regulated the speech because it disagrees with its content" is *no.* *New York County Bd. of Ancient Order of Hibernians v. Dinkins,* 814 F.Supp. 358, 368 (S.D.N.Y.1993) (citing *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989)). To the contrary, the undisputed facts reveal that the government regulated plaintiffs' speech because they physically intruded upon another previously permitted event and interfered with the speech of the permittee. No reasonable fact-finder could conclude otherwise.

■ As plaintiffs admit, they were "demonstrating in the same manner and at the same time and place as the pro-Bush/Quayle demonstrators." Brief in opposition at 23–24. It is precisely the avoidance of the cacophony which such action creates that is the constitutionally allowed aim of a permit system. It is well settled, for example, that the government may permit one group to parade down a street and forbid another group to "demonstrate[ ] in the same manner and at the same time and place." *Id.* *See Glasson v. City of Louisville,* 518 F.2d 899, 904 (6th Cir.1975), *cert. denied,* 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975) (the state "may determine not to permit two parades to proceed along the same street at the same time, or two rallies to be held simultaneously in the same part of a public park"). It is also settled that a private group which has obtained from the government a permit to hold a parade in a public forum may preclude other private speakers from taking part in the permittee's expressive activity. *Hurley,* —— U.S. ——, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995); *Invisible Empire,* 700 F. Supp. 281 (D.Md.1988). These precepts hold equally for stationary assemblies, such as the Committee's rally. Without the defendants' implementation and enforcement of the permit system, the First Amendment rights of all citizens—including plaintiffs—could easily be lost in the noise.

In conclusion, this Court holds, based on the undisputed facts and as a matter of law, that defendants actions enforced a permit system that: (1) was content-neutral; (2) was narrowly tailored to serve significant government interests; and (3) left open ample alternative channels of communications. Thus, the defendants' "suppression" of plaintiffs' expression did not violate the precepts of the First Amendment. Accordingly, defendants' motion for summary judgment on plaintiffs' First Amendment claims is GRANTED.

### IV.

■ The Court has now granted defendants' motion for summary judgment on plaintiffs' First Amendment claims, and has granted plaintiffs' motion to voluntarily dismiss their Sixth Amendment claims. The only remaining claims are brought under state law, for false arrest. Subject matter

jurisdiction in this case was based on the existence of a federal question. This Court has jurisdiction over plaintiffs' state law claims only if they are so related to her federal law claims that they are part of the same case or controversy. 28 U.S.C. § 1367(a) (defining the court's "supplemental" jurisdiction). Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction if the federal claims over which it had original jurisdiction have all been dismissed. "[I]f the federal claims are dismissed before trial, ... the state claims should be dismissed as well." *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Williams v. City of River Rouge,* 909 F.2d 151, 157 (6th Cir.1990). Accordingly, this Court, in its discretion, dismisses plaintiffs' supplemental state law claims, without prejudice, for lack of a substantial federal claim.

**IT IS SO ORDERED.**

### *ORDER*

For the reasons set forth in this Court's Memorandum & Order of this date, the defendants' motion for summary judgment on plaintiffs' First Amendment claims is **GRANTED;** the plaintiffs' motion to voluntarily dismiss their Sixth Amendment claims is **GRANTED;** and this Court, in its discretion, **DISMISSES** plaintiffs' supplemental state law claims, without prejudice, for lack of a substantial federal claim.

**IT IS SO ORDERED.**